**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JACKIE L. BOERNGEN,** | ) | **CASE NO. 5:13CV2520** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MAGISTRATE JUDGE** |
| **v.** | ) | **GEORGE J. LIMBERT** |
| | ) | |
| **CAROLYN W. COLVIN[1],** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| **Defendant.** | ) | |

Jackie L. Boerngen ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Court AFFIRMS the ALJ's decision and dismiss Plaintiff's case with prejudice.

## I.    PROCEDURAL AND FACTUAL HISTORY

Plaintiff applied for SSI on April 20, 2005, alleging disability beginning June 20, 2004 due to fibromyalgia, bullae disease, pulmonary emphysema and a brain tumor. Transcript ("Tr.") at 37, 71, 80.  The Social Security Administration denied her application initially and upon reconsideration. *Id*. at 59-66. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and on January 7, 2009, the ALJ conducted a hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id*. at 422. On February 11, 2009, the ALJ issued a Decision denying benefits. *Id*. at 24-35. Plaintiff requested review of the Decision, and on June 30, 2009, the Appeals Council denied review. *Id*. at 16-20.

On November 13, 2013[2], Plaintiff filed the instant suit seeking review of the Decision. ECF

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]  The Court notes the extreme delay between the Appeals Council's June 30, 2009 decision and Plaintiff's filing of the instant complaint on November 13, 2013. ECF Dkt. #1 and Tr. at 16. Plaintiff's counsel explains in her brief on the merits that on September 2, 2009, she filed a timely request to the Appeals Council for an extension of time

Dkt. #1. On March 20, 2014, the parties consented to the jurisdiction of the undersigned.  ECF Dkt. #15.  On April 19, 2014, Plaintiff filed a brief on the merits.  ECF Dkt. #17. On May 19, 2014, Defendant filed a brief on the merits.  ECF Dkt. #18.  On June 2, 2014, Plaintiff filed a reply brief. ECF Dkt. #19.

## II.    RELEVANT MEDICAL HISTORY AND HEARING TESTIMONY

### A.    Mental Health History

In her brief, Defendant reviews only Plaintiff's mental health history, noting that a review of Plaintiff's physical health history is unnecessary because Plaintiff is challenging only the ALJ's mental RFC for her.   Accordingly, the Court recites the relevant medical history concerning Plaintiff's mental impairments as well.

On February 23, 2003, Plaintiff was taken to the emergency room after a friend contacted police two hours prior stating that Plaintiff had taken a handful of Tylenol PM.  Tr. at 397.  Plaintiff had also consumed alcohol and a suicide note was found at the scene.  *Id*.  Plaintiff's past medical history noted a prior overdose with an unknown medicine.  *Id.*  Plaintiff was hospitalized and received treatment.  *Id*. at 398.

On July 21, 2004, Plaintiff underwent a CT scan of her head after she was assaulted and had swelling around her left cheek.  Tr. at 144.  The CT showed a low attenuation area in the left frontal lobe which was probably a subarachnoid cyst, but further evaluation was recommended.  *Id.* Impressions included a soft tissue swelling over the left cheek, no acute fracture, and a concha bullosa, bilaterally.  *Id.*

From October 23, 2004 through October 27, 2004, Plaintiff was hospitalized after presenting with pain, redness and swelling of the left breast.  Tr. at 136.  She explained that she had her left nipple pierced two years prior and had some pain and swelling since then, but the pain and swelling she was experiencing at that time was different and worse.  *Id.* at 138.  The treating doctor noted that Plaintiff had a psychiatric history of manic depression, anxiety and schizophrenia and these

---

in which to file the current claim and that request stayed at the Appeals Council for four years, despite counsel's numerous inquiries into the status of the extension. ECF Dkt. #17 at 2-3.  On October 17, 2013, the Appeals Council granted Plaintiff's request for an extension of time within which to file a complaint in this Court.  Tr. at 5-6.

conditions were well-controlled on medications.  *Id.*  Plaintiff's final diagnoses were abscess of the left breast, phlebitis of the right arm and history of major depression.  *Id.* at 136.

Plaintiff had also complained of headaches, vision and hearing loss and she underwent a brain MRI on October 23, 2004 which showed a left frontal arachnoid cyst, numerous foci of increased signal on T2 and flair images in the bilateral deep and subcortical white matter that were nonspecific but could be a result of demyelination, inflammation or chronic ischemic changes.  Tr. at 141.  The discharge summary from the hospital noted that Plaintiff had asked about the MRI and the doctor reviewed it with her and noted that Plaintiff may have signs of early multiple sclerosis ("MS").  *Id.*

On December 13, 2004, Plaintiff complained of numbness, imbalance, tremor headaches and migraines to Dr. Weiss, a neurologist.  Tr. at 193.  He found Plaintiff's mental status to be alert, her affect and fund of knowledge were normal, as well as her attentiveness, speech and short-term memory.  *Id.* at 194. 227.  His impressions were an abnormal MRI with a benign tumor and rule out MS.  *Id.* at 194-195.

Plaintiff followed up at Dr. Weiss' office throughout 2005 and 2006.  Tr. at 179-229.  At each visit where an examination was performed, it was noted that Plaintiff was alert and oriented, with normal attentiveness, fund of knowledge, and normal speech and language.  *Id.*

On April 15, 2005, a brain MRI showed multiple small non-specific foci of increased signal intensity in the subcortical and deep white matter decreased in size and contiguity from the last examination that may be related to foci of demyelinative or inflammatory disease.  Tr. at 146.  The doctor's impressions also included an arachnoid cyst, which was unchanged from the last MRI , and increased signal intensity of the adjacent left frontal lobe gyrus, unchanged from the last MRI which may be related to reactive change or gliosis.  *Id.*

On May 27, 2005, Plaintiff had another brain MRI for complaints of whole body pain and headaches.  Tr. at 176.  It showed the same impressions as the April 15, 2005 MRI.  *Id.*

On May 30, 2005, Plaintiff underwent a head CT scan for trauma, which revealed no abnormalities.  Tr. at 199.

-3-

On January 1, 2006, Dr. Weiss indicated that Plaintiff was doing fairly well with the medications he had prescribed and she was doing well on Lyrica as she reported no severe migraines since November of 2005 but she had run out of medication.  Tr. at 205.  Dr. Weiss' diagnoses were headaches, controlled by Lyrica, frontal arachnoid cyst which was followed by the Cleveland Clinic, chronic pain, and neck pain with a C6 radiculopathy.  *Id.*  Dr. Weiss refilled the Lyrica.  *Id.*

On January 30, 2006, Dr. Nanjundiah performed a psychiatric evaluation of Plaintiff for treatment purposes.  Tr. at 282.  Plaintiff informed her that she was seeing a psychiatrist for the past three years but he refused to treat her in Cuyahoga Falls and referred her to Dr. Nanjundiah.  *Id.*  Plaintiff indicated that she had been out of all of her medications for the last month except for Wellbutrin.  *Id.*  Plaintiff reported being frightened all day, especially of people, and was afraid of the radio and television.  *Id.*  She also reported recurrent panic attacks that were brought on by being near crowded areas.  *Id.*  She indicated that the panic attacks were well-controlled until she ran out of medication.  *Id.*  Plaintiff related her history, including her childhood where she got good grades in school but had to drop out when she was 14 or 15 because she got pregnant.  *Id.* at 283.  She noted that she did get her GED.  *Id.*

Upon examination, Dr. Nanjundiah found that Plaintiff had goal-directed form of thought, no evidence of perceptual disturbance, normal psychomotor activity, anxious mood, inappropriate affect as she smiled while speaking of her unstable childhood, intact memory, fair attention and concentration, and partial insight and judgment.  Tr. at 284.  Dr. Nanjundiah diagnosed Plaintiff with bipolar disorder, type II, rapid cycle type and panic disorder with/without agoraphobia, alcohol abuse, borderline personality traits, and arachnoids cysts and frontal lobe seizures.  *Id.*  She rated Plaintiff's global assessment of functioning at 55, which indicated moderate symptoms.  *Id.*  She restarted Plaintiff on Prozac and Lamictal and recommended that Plaintiff continue individual psychotherapy.  *Id.* at 284-285.

January 31, 2006 treatment notes from Dr. Weiss' office indicated that the Cleveland Clinic was monitoring Plaintiff's arachnoid cyst and doctors there believed that surgery was not necessary.  Tr. at 205.

On February 27, 2006, Plaintiff followed up with Dr. Nanjundiah and reported that her panic attacks had decreased in frequency and although she still felt overwhelmed and suffered from panic attacks and insomnia, she was working and reported that she was doing better on Prozac as her mood swings were not as pronounced.  Tr. at 280.  Dr. Nanjundiah noted that Plaintiff had good eye contact, regular speech, goal-directed thought processes, no perceptual disturbances, tired mood, broad but appropriate affect, intact memory, and improving insight and judgment.  *Id.*  Plaintiff's medications were adjusted.  *Id*.

On March 10, 2006, Dr. Sipps, Ph.D., a psychologist, performed an evaluation of Plaintiff for the agency.  Tr. at 234.  Plaintiff reported to Dr. Sipps that she quit school after the ninth grade, subsequently earned her GED and completed 1.5 years of college without earning a degree.  *Id*. at 235.  She indicated that she did not attend school frequently because she had to care for her mother, who was an alcoholic and drug addict.  *Id.* at 234-235.  Plaintiff stated that the longest time that she worked was for four months and she had two daughters.  *Id*. at 235.

Plaintiff informed Dr. Sipps that she first began psychiatric treatment when she was an adolescent and intermittently received such treatment.  Tr. at 235.  She explained that she was hospitalized in 2003 following a suicide attempt.  *Id*. She reported that she fell through a staircase when she was three years old and was in a coma for three months.  *Id*.

Dr. Sipps found that Plaintiff had appropriate eye contact, no delusional or grandiose thinking, low average concentration and attention to task, and adequate insight and judgment, Tr. at 238.  He diagnosed Plaintiff with bipolar disorder, not otherwise specified, and anxiety disorder, both in partial remission with treatment.  *Id.*  He opined that Plaintiff's ability to concentrate and to attend to tasks was low average with the ability to understand simple directions without difficulty and only mild limitation in the ability to comprehend complex material.  *Id.*  Dr. Sipps further opined that Plaintiff's sustained concentration and persistence would be unimpaired as she stated that she was able to read novels, write short stories and poetry, and watch 60-minute television shows without any difficulty.  *Id*.  As to Plaintiff's capacity for social interaction, Dr. Sipps opined that Plaintiff was moderately impaired in interacting with the general public, mildly impaired in interacting effectively with supervisors and co-workers, and unimpaired in relating to others who

were familiar to her.  *Id.* at 238-239.  Dr. Sipps opined that Plaintiff had low average ability for adaptation with mild impairment in responding appropriately to new situations and to changes in the work setting.  *Id.* at 239.  He rated Plaintiff's GAF at 57 with current treatment, which indicated moderate symptoms.  *Id.*

On March 24, 2006, Dr. Chambly, Psy.D., an agency psychologist, conducted a review of Plaintiff's file and completed a psychiatric review technique form and mental RFC.  Tr. at 241-258. She assessed Plaintiff's impairments from June 20, 2004 through March 24, 2006 under Listing 12.04 for affective disorders and Listing 12.06 for anxiety-related disorders based upon Plaintiff's mood disorder not otherwise specified.  *Id.* at 241-250.  She found that Plaintiff's impairment mildly restricted her activities of daily living, caused moderate difficulties in maintaining social functioning, caused moderate restrictions in maintaining concentration, persistence or pace, and did not cause her to experience any episodes of decompensation.  *Id.* at 251.  As to Plaintiff's mental RFC, Dr. Chambly concluded that Plaintiff  was not significantly limited in any area of understanding and memory or in sustaining concentration and persistence.  *Id.* at 255.  She opined that Plaintiff was moderately limited in only one area of social interaction, that of interacting appropriately with the general public.  *Id.* at 256.  She further opined that Plaintiff was moderately limited in only one area of adaptation, that of responding appropriately to changes in the work setting.  *Id.*

On April 20, 2007, Dr. Kontos, a psychiatrist, conducted an initial psychiatric evaluation of Plaintiff.  Tr. at 330-333.  Plaintiff presented complaining that her medications of Prozac, Vistaril and Buspar were not helping her much as she had felt markedly increased anxiety over the past three months and was unable to go to the store.  *Id.* at 330.  She complained of increased panic and phobia and tended to isolate herself and even became tense in comfortable situations with familiar people. *Id.*  She reported intermittent hypomanic states of up to three days where she needed less sleep, she had racing and spinning thoughts, rapid speech, hyperactivity and impulsivity.  *Id.*  She also reported intermittent seizures in which she felt like everything hurt her, even when people just looked at her. *Id.*  She reported hearing voices, shaking, having difficulty with attention and concentration, and she stated that it took her three days to recover from such episodes.  *Id.* at 330-331.

-6-

Upon examination, Dr. Kontos found that Plaintiff was alert, slightly disheveled, markedly anxious and well oriented.  Tr. at 332.  He noted that she had decreased eye contact and mild psychomotor deceleration with underlying moderate degree of anxiety.  *Id.*  He noted no tremors.  *Id.*  Dr. Kontos found Plaintiff 's speech to be coherent, conversational, and not pressured, and her thoughts were ruminative, severely obsessive and she admitted to obsessive-compulsive patterns.  *Id*.  He found her mood to be moderately anxious with mild-to-moderate depressive state and underlying anger repressed with irritability and low resonance of affect.  *Id*.  Dr. Kontos further noted that Plaintiff's attention and concentration were overall average, she had no perceptual deficits, her memory was intact and her insight and judgment were overall average.  *Id.*  He diagnosed Plaintiff with bipolar affective disorder, type II, with rapid cycling, primary recurrent mild-to-moderate degree of mixed depressive states with grief transient hypomanic states two to three days in a row, which were intermittent, sometimes every few weeks, other times skipping several months, with Plaintiff reporting more than four episodes of depressive states lasting more than four to eight weeks.  *Id.*  He further diagnosed generalized anxiety disorder with panic with and without agoraphobia, currently moderate degree of agoraphobia and phobic avoidance.  *Id.*  He also diagnosed alcohol abuse, periodic and excessive, mixed personality disorder, past post-traumatic stress disorder, history of frontal lobe arachnoid cyst, frontal lobe seizure and history of mixed headaches secondary to arachnoid cyst frontal lobe and migrainous.  *Id.*  He rated her GAF as 51, indicative of moderate symptoms.  *Id.*  Dr. Kontos adjusted Plaintiff's medications, adding some new ones and decreasing others.  *Id*. at 333.

On May 2, 2006, Plaintiff followed up with Dr. Weiss and reported that her headaches were worsening and she had a daily migraine for three weeks.  Tr. at 201.  She also reported tremors and transient numbness.  *Id.*  Upon examination, Dr. Weiss noted that Plaintiff had restless sleep, depression and anxiety, but she was alert, oriented and had normal affect, attentiveness, fund of knowledge and speech.  *Id*. at 202-203.  He made adjustments to her medications*. Id.* at 201.  He wanted to give her an injection of Imitrex, but could not do so because her blood pressure was elevated.  *Id*.  He added medications and increased others, and diagnosed migraine headaches, frontal arachnoid cyst, chronic pain and neck pain with C6 radioculopathy.  *Id*.

On May 10, 2006, progress notes from Dr. Nanjundiah indicate that Plaintiff presented complaining of continued depression with periods of panic attacks.  Tr. at 278.  She indicated that she had to quit her job at a greenhouse which was a seasonal job.  *Id*.  Plaintiff reported a decrease in panic attacks to two per week.  *Id*.  She also reported a little bit better sleep.  *Id*.  Examination showed that Plaintiff spoke in a monotone, with intermittent eye contact, linear thought process, decreased psychomotor activity, dysphoric mood, constricted affect, intact memory and improving insight and judgment.  *Id*.  Dr. Nanjundiah diagnosed panic disorder with or without agoraphobia, bipolar disorder, type II, rapid cycling, currently depressed.  *Id*.  She increased Plaintiff's Prozac, continued her on Elavil, and added Depakote.  *Id*.

On May 16, 2006, Dr. Mohan wrote a letter indicating that he treated Plaintiff on a monthly basis for her mental health conditions from March 11, 2003, after her discharge from the hospital for major recurrent depression, until November 8, 2005.  Tr. at 297.  He noted that her symptoms were that she felt overwhelmed, tired, frustrated, worried, jittery, fearful, sad, anxious, nauseous and crying, and her medications included Abilify, Trazodone, Prozac and Wellbutrin.  *Id*.

On May 23, 2007, Plaintiff presented to Dr. Kontos for medication follow-up.  Tr. at 327.  He noted Plaintiff's current medications as Prozac, Buspar, Gabitril, Klonopin and Eskalith CR.  *Id*.  Plaintiff reported that she had improvement in her anxiety, panic and agoraphobia and she was able to get out of the house more.  *Id*.  She indicated that she was looking forward to a camping trip with three of her friends.  *Id*.  She also stated that she was having no seizures and she felt that she had a better mood and had better motivation.  *Id*.  Upon examination, Dr. Kontos found that Plaintiff was well-oriented, had coherent and conversational speech, fair eye contact, and some somatic preoccupation.  *Id*. at 328.  He noted that she had a mildly depressed mood, was mildly to moderately  anxious, had fair attention and concentration, intact memory and average insight and judgment.  *Id*.  He diagnosed Plaintiff with bipolar affective disorder, type II, with rapid cycling with suppression of mood instability with current medication regimen, generalized anxiety with panic and agoraphobia with partial resolution of phobic avoidance with current medication, support and motivation, mixed personality disorder with past PTSD, and he rated her GAF at 54, indicating moderate symptoms.  *Id*.  He noted that Plaintiff had improved stabilization of mood without major

-8-

depressive states, hypomania, or irritability, and she had partial reduction in panic, anxiety and phobic avoidance with motivation and current medications.  *Id.*

Dr. Kontos also completed a mental RFC for Plaintiff for the Ohio Department of Job and Family Services on May 23, 2007.  Tr. at 334.  He opined that Plaintiff was not limited in: sustaining an ordinary routine without special supervision; in asking simple questions or requesting assistance; or in maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.  *Id.*  He further opined that Plaintiff was not significantly limited in: understanding, remembering and executing very short and simple instructions and in remembering locations and work-like procedures; making simple, work-related decisions; being aware of normal hazards and taking appropriate precautions; and in traveling in unfamiliar places or using public transportation.  *Id.*  He concluded that Plaintiff was moderately limited in:  interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and in responding appropriately to changes in the work setting.  *Id.*  Finally, Dr. Kontos opined that Plaintiff was markedly limited in: understanding, remembering and executing detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance and being punctual within customary tolerances; and in working in coordination with or proximity to others without being distracted by them.  *Id.*

On June 9, 2007, Plaintiff underwent a brain MRI which showed no definite significant interval change from the previous MRI of April 15, 2005, areas of probable encephalomalacia in both frontal lobes and multiple areas of subcortical increased signal intensity in the white matter of both hemispheres that was not typical for MS but could be a small vessel occlusive disease or post-traumatic changes with axonal old shearing injury or prior toxin exposure.  Tr. at 321.

October 24, 2007 progress notes from Dr. Kontos indicate that Plaintiff presented for medication follow-up and reported that she was feeling somewhat anxious, depressed and tense because she had a recent rash that was undiagnosed but cleared up, she underwent breast surgery for a benign mass but had to undergo another breast surgery because the margins were not clear, she had issues with her roommate who had past legal charges, she still had migraines, and she had issues concerning a family for whom she was babysitting as the mother and father had problems and the

father was aggressive toward her.  Tr. at 351.  She related that she was still having seizures in that she became shaky, had lowered attention and concentration, and this caused preoccupation of a general feeling of hurting all over and fearing people.  *Id.*  She reported eight seizures over the past 1.5 months, which she attributed to stress and lack of sleep.  *Id.*  Upon examination, Dr. Kontos noted that Plaintiff had mildly decreased psychomotor activity, no tremors, coherent speech, fair eye contact, obsessive and ruminative thought with somatic preoccupation, mildly depressed mood, mild to moderate anxiety with low resonance of affect, and underlying frustration.  *Id.* at 351-352.  He found her attention, concentration, memory and perception to be normal and her insight and judgment to be fair.  *Id.* at 352.  He diagnosed Plaintiff with bipolar affective disorder, type II, with rapid cycling and mild mixed mood state, mild to moderate generalized anxiety disorder with panic, mixed personality disorder with PTSD, and he rated her GAF at 53, indicating moderate symptoms.  *Id.*  He noted that Plaintiff continued to have low-grade mood shifts with anxiety, depression and frustration with nightmares, and she was bothered by headaches.  *Id.*

On July 7, 2008, Plaintiff presented to Dr. Kontos for a follow-up and reported that she had been homeless for the past two months as she was living in a camper.  Tr. at 400.  Dr. Kontos noted that Plaintiff was anxious and depressed which was in part reactive to her situation.  *Id.*  He continued her medications.  *Id.* at 401.

Plaintiff followed up with Dr. Kontos on September 24, 2008 and reported that she was now in a safer place and was able to get out more without anxiety attacks and had good relationships.  Tr. at 402.  She indicated that she was feeling better and was in fair spirits with no major mood shifts.  *Id.*  Dr. Kontos noted that Plaintiff was euthymic with only mild anxiety.  *Id.*

On November 12, 2008, Plaintiff presented to the emergency room complaining that she was upset and had cut her arms with a razor blade.  Tr. at 417.  She indicated that she was not trying to kill herself, but had a history of depression and cutting herself.  *Id.*  She denied any specific trigger and she stated that she was taking her medications regularly.  *Id.*  Upon examination, the doctor noted an odor of alcohol and that Plaintiff was very cooperative, appropriate and had superficial flat abrasions with no active bleeding on her forearms.  *Id.* at 418.  Plaintiff was diagnosed with bilateral

-10-

wrist abrasions, depression with no suicidal ideation, and alcohol intoxication.  *Id.*  She was to be discharged when she was sober.  *Id.*

On December 15, 2008, Dr. Kontos completed a mental RFC questionnaire opining that Plaintiff had marked impairments in: relating to other people; performing daily activities; responding to customary work pressures; responding appropriately to changes in the work setting; performing complex, repetitive or varied tasks; and in behaving in an emotionally stable manner.  Tr. at 415-416.  He further opined that Plaintiff was moderately impaired in: maintaining concentration and attention for extended periods; sustaining a routine without special supervision; performing activities within a schedule, with regular attendance, and with punctuality; in understanding, remembering and carrying out instructions; in responding appropriately to supervision and co-workers; and in using good judgment.  *Id.*  Dr. Kontos identified his diagnoses for Plaintiff as bipolar affective disorder II, generalized anxiety/panic disorder, migraine, asthma, and frontal lobe arachnoid cyst.  *Id.* at 416.  He concluded that Plaintiff's conditions would likely deteriorate if she were placed under stress, especially that from a job, and she would most likely be absent from work more than three times per month due to her impairments or treatment.  *Id.*  In the comments section of the questionnaire, Dr. Kontos wrote that Plaintiff was "unable to work in any sustained gainful employment due to rapid cycling moods severe anxiety with impaired attention and concentration."  *Id.*

### B.    Hearing testimony

Plaintiff, who was forty years old at the time of the hearing, testified that she was living in a mobile home with an adult male.  Tr. at 428-429.  When asked why she filed for disability, Plaintiff responded that she felt that she could not take care of everything anymore as she did not have a man taking care of her and she was not capable of taking care of her children anymore.  *Id.* at 429.  She explained that she had stopped working full-time on a line transplanting flowers right before she filed for disability because the job was seasonal and she was having trouble lifting and carrying things, even flats of flowers that weighed five pounds.  *Id.* at 430-431.  She testified that the lifting and carrying caused pain in her knees, arms and back due to the bending and repetitive lifting.  *Id.* at 431.  She tried to apply for other jobs, such as cashier jobs, but they were not full-time jobs.  *Id.* at 432.  She related that she believed that she could not work such jobs on a full-time basis

-11-

because she could not stand that long. *Id.* When asked if she thought that she could perform a job that did not require her to stand for long periods, she stated that she was still unable to work full-time because she could not sit all of the time due to her pain. *Id.* She elaborated that she had the most pain in her lower back and it was aggravated by the weather, lifting, twisting, standing too long and sitting too long. *Id*. at 433. She opined that she could stand for about twenty minutes before her pain would increase and she could sit for about an hour before the pain would increase. *Id.* She indicated that lifting even a box of laundry detergent caused her back to hurt. *Id*. at 434.

Plaintiff explained that she no longer took medication for her back pain because it made her too tired when combined with the other medications that she was taking. Tr. at 435. She also described shoulder and neck pain that she experienced. *Id.* She further described her fibromalgia and related that her insurance no longer covered the medication that she was taking for it even though it seemed to help. *Id.* at 438. She also described her headaches. *Id*. at 439-440. She identified her daily activities as cleaning the house, cooking, watching birds, and going to the grocery store once in awhile. *Id.* at 442. She explained that she no longer took the garbage out because it hurt her back and she uses a half-size laundry basket rather than a full-size one to do the laundry. *Id.* Besides watching the birds, she crochets a little and occasionally reads horror stories. *Id*. at 443. Her fourteen year-old child also comes to visit her and they cook together, play on the computer and do their hair and makeup. *Id*. at 443-444.

Plaintiff indicated that she no longer drives because she was too nervous and she gets along most of the time with people but they also made her nervous. Tr. at 444-445. She explained that she has problems with depression and the degree of her depression varied as sometimes she became depressed several times per day and she feels depressed to the point of suicidal three to four times per year. *Id.* at 446. Plaintiff testified that spending time with her daughter helped her during such times and the medications that she was taking made her feel better than she used to feel. *Id.* at 447. Upon questioning by her counsel, Plaintiff described her anxiety as feeling very frightened in unfamiliar places with unfamiliar people which leads her to have an anxiety attack. *Id*. at 449. She indicated that her daily medications made her tired, but she did not nap during the day because she

-12-

would be up all night.  *Id*. at 450.  She stated that her medications made her forgetful and she sometimes forgets if she has taken all of her medications.  *Id*. at 451.

The ALJ then asked about Plaintiff's babysitting for an acquaintance one year prior to the hearing.  Tr. at 453-454.  Plaintiff explained that she babysat a one or two-year old child for this acquaintance for about three months.  *Id*. at 454.  She testified that she had to lift the child when she cared for him and she received a place to stay and sometimes money for babysitting.  *Id*.

The VE then testified.  The ALJ asked the VE whether work was available in significant numbers in the national economy for a hypothetical individual who had the same age, education and work experience as Plaintiff, with the abilities to: lift and/or carry twenty pounds occasionally and ten pounds frequently; sit and stand/walk up to six hours of an eight-hour workday; occasionally push and pull with her upper extremities; occasionally climb ramps or stairs; no ability to climb ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; the need to avoid work environments that were extremely cold, or those involving smoke, fumes, dust and gases; understanding, remembering and executing only simple instructions; only occasionally interacting with co-workers and supervisors; and no direct interaction with the general public.  Tr. at 457.  The VE testified that such jobs existed for this hypothetical individual, such as the jobs of gasket inspector, mail clerk but not in the post office, and assembler of small parts.  *Id.* at 457-458.

Counsel for Plaintiff added restrictions to the ALJ's hypothetical person, including a limitation of being absent from work on average more than three times a month.  Tr. at 458-459. The VE testified that the jobs that she identified would still be available, but such a person would have trouble sustaining any job on a full-time basis with this limitation.  *Id*. at 459.  Plaintiff's counsel then added a mental limitation of a marked impairment in responding to customary work pressures, and the VE stated that such an individual could not sustain full-time work of any kind. *Id*.  Plaintiff's counsel added a marked limitation in the hypothetical person's ability to respond appropriately to changes in the work setting and the VE stated that her answer would be the same, that such a person could not perform full-time work on a sustained basis.  *Id.*  The VE responded the same way to counsel's subsequently added marked limitation in behaving in an emotionally stable

-13-

manner in the work place, and migraine headaches resulting in absences of more than three per month and having to lie down in a dark room while at work.  *Id*. at 459-460.

### III.       SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from degenerative disc disease in the spine, fibromyalgia, headaches and bipolar disorder, which qualified as severe impairments under 20 C.F.R. §416.921 et seq.  Tr. at 26.  The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. § 416.925 and 416.926 ("Listings").  *Id*. at 26-27.  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(a), except that:  she could push and pull with her upper extremities only occasionally; she could sit, stand and/or walk up to six hours per eight-hour workday; she could not climb ladders, ropes, or scaffolds; she could only occasionally climb ramps and stairs; she could occasionally balance, stoop, kneel, crouch, and crawl; she must avoid extreme cold, smoke, fumes and gases; her work must be limited to work involving understanding, remembering and executing simple instructions; she was limited to occasional interaction with co-workers and supervisors; and she could not interact with the general public.  *Id*. at 27-28.

In determining this RFC, the ALJ acknowledged Dr. Kontos' marked limitations for Plaintiff, but found that his treatment notes and Plaintiff's reports of her daily activities belied such marked limitations.  Tr. at 31-32.  The ALJ further noted that Dr. Kontos never rated Plaintiff's GAF at lower than 51, which indicated moderate limitations.  *Id.* at 32.  The ALJ also referred to Plaintiff's hearing testimony and reports in the record indicating that she babysat a two year-old, fed her cats, used public transportation, walked her dog, went camping with friends, wrote poetry, letters and short stories, made crafts, watched movies, looked for jobs, cleaned, cooked, bird-watched, shopped, did laundry, crocheted, did her daughter's hair and makeup, and used a computer.  *Id*. at 30.

Based upon VE's testimony, the ALJ ultimately concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of gasket inspector, mail clerk but not in a post office, and small parts assembler.  Tr.

at 35.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to SSI.

## IV.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

-15-

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**VI.**     **ANALYSIS**

Plaintiff's sole assertion in this case is that the ALJ erred in determining her mental RFC because he failed to include a speed or pace-based limitation as opined by a state agency physician and Plaintiff's treating psychiatrist. ECF Dkt. #17 at 12-18.

It is the ALJ who is responsible for determining a claimant's RFC. 20 C.F.R. § 404.1546(c); *Fleisher v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011). The RFC is the most that a claimant can still do despite her restrictions. Social Security Ruling ("SSR") 96-8p. It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*. It is a claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id*. The Ruling defines a "regular and continuing basis" as 8 hours per day, five days per week, or the equivalent thereof. *Id.*

In determining a claimant's RFC, SSR 96-8p instructs that the ALJ must consider all of the following:  (1) medical history; (2) medical signs and lab findings; (3) the effects of treatment, such as side effects of medication, frequency of treatment and disruption to a routine; (4) daily activity reports; (5) lay evidence; (6) recorded observations; (7) statements from medical sources; (8) effects caused by symptoms, such as pain, from a medically determinable impairment; (9) prior attempts at work; (10) the need for a structured living environment; and (11) work evaluations.  SSR 96-8p. The ALJ must provide "a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Id*.  The ALJ must also thoroughly discuss objective medical and other evidence of symptoms such as pain and set forth a "logical explanation" of the effects of the symptoms on the claimant's ability to work. *Id.*  However, "[ a]n ALJ need not discuss every piece of evidence in the record in order for his decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661,665 (6th Cir. 2004), unpublished.

The Court notes that Plaintiff does not challenge the ALJ's Step Three finding or his application of the treating physician rule to the medical source statements of Dr. Kontos.  Nor does Plaintiff challenge the weight that the ALJ attributed to the other physician opinions or the ALJ's credibility determination.

Rather, Plaintiff asserts that the ALJ erred by failing to include a speed or pace-based restriction in his RFC for her.  Plaintiff cites to *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010) for the proposition that an ALJ's failure to include a speed and pace-based restriction in the RFC is reversible error when the claimant is found to have such limitations at prior steps of the sequential evaluation.  ECF Dkt. #17 at 14.  Plaintiff further cites to cases in this District finding that "*Ealy* advocates a fact-based approach to determine whether, considering the record evidence, the plaintiff required specific limitations regarding his or her moderate difficulties with concentration, persistence, or pace." *Id*., quoting *Weagraff v. Comm'r of Soc. Sec.*, 2013 WL 968268 (N.D. Ohio, Jan. 7, 2013), Report and Recommendation adopted sub nom., *Weagraff v. Colvin*, 2013 WL 980435 (N.D. Ohio, Mar. 7, 2013).  Plaintiff posits that the ALJ erred in his RFC because he omitted the moderate restrictions in concentration, persistence and pace that he had found

-17-

at Step Three of the sequential analysis and Dr. Chambly and Dr. Kontos had found that Plaintiff had limitations in such areas.  ECF Dkt. #17 at 15.

Plaintiff is correct that in his Step Three analysis of whether her impairments met or medically equaled a Listing, the ALJ found that Plaintiff had moderate difficulties in concentration, persistence and pace when he addressed the functional limitations in evaluating her mental impairments.  Tr. at 27.  However, as noted by the ALJ in his decision in this case, and further emphasized by SSR 96-8p, the ALJ's assessment of mental disorders at Steps Two and Three

> are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p.  Accordingly, the ALJ's Step Three findings are not part of the RFC assessment. *Harrod v. Colvin*, No. 1:14CV805, 2015 WL 106102, at *16 (N.D. Ohio, Jan. 7, 2015).

Further, *Ealy* is distinguishable from the instant case.  In *Ealy,* the non-examining physician specifically limited Ealy's ability to sustain attention to complete simple repetitive tasks "for two hour segments over an eight-hour day where speed was not critical."  594 F.3d at 516.  Thus, the physician had limited Ealy's ability to sustain attention over time, even when she was performing simple, repetitive tasks.  The ALJ relied upon this physician's assessment, but did not incorporate this limitation into the hypothetical individual that he presented to the VE.  *Id*. at 510-511.  Rather, he limited Ealy to simple, repetitive tasks without the additional time limitation.  Yet the ALJ determined in his decision that Plaintiff had moderate difficulties in concentration, persistence or pace.  *Id*. at 510.  The Sixth Circuit held that "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."  *Id*. at 516 [citations omitted].  The Court found that the ALJ's hypothetical to the VE should have included the restriction that the hypothetical person could perform for two hour segments during an eight-hour workday and speed could not be a critical factor to his job.  *Id.*

-18-

Here, the ALJ limited Plaintiff to tasks that involved simple instructions, occasional interaction with co-workers and supervisors and no interaction with the general public.  Tr. at 28. No medical source in this case opined restrictions like that in *Ealy*.  The only speed or pace-based restriction even mentioned in the instant case was a comment from Dr. Chambly, an agency reviewing psychologist, who stated that "[s]tress tolerance is not impaired for routine tasks without strict time production."  *Id.*  at 256.  Plaintiff asserts that since the ALJ attributed weight to Dr. Chambly's opinion, he should have incorporated a speed or pace-based restriction into her mental RFC.  ECF Dkt. #19 at 2.

The Court finds no merit to this assertion.  While he attributed some weight to Dr. Chambly's mental RFC assessment, the ALJ attributed the most weight to the opinions of Dr. Sipps, the agency examining psychologist, who found that Plaintiff had low average ability to concentrate and attend to tasks and found that she was unimpaired in her capacity for sustained concentration and persistence, and in directing her attention effectively to tasks for a reasonable period of time.  Tr. at 31, 238.  In making such an opinion, Dr. Sipps cited to Plaintiff's presentation and abilities at the evaluation and her report that she read novels, wrote short stories and poetry, and had the ability to watch sixty-minute plus television shows and movies without impairment.  *Id.* at 238.

Nevertheless, the ALJ did attribute some weight to the opinions of Dr. Chambly, but he based that weight on the opinions' consistency with those of Dr. Sipps and with Plaintiff's wide range of daily activities.  Tr. at 31.  Dr. Chambly opined that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace in her assessment of the "B" criteria of the Listings in rating Plaintiff's functional limitations for Step Two and Step Three purposes.  Tr. at 251.  In her mental RFC for Plaintiff, however, she found that Plaintiff was not significantly limited in any of the eleven areas of sustained concentration and persistence.  *Id.* at 256.  In the narrative following the assessment, Plaintiff is correct that Dr. Chambly did state that "[s]tress tolerance is not impaired for routine tasks without strict time production."  *Id.*  The ALJ quoted this statement in his decision. *Id.* at 31.  However, Dr. Chambly's statement preceding the one cited by Plaintiff indicated that "[t]he claimant's ability to sustain concentration, persistence and pace is not significantly impaired for routine tasks."  *Id.* at 257.  The ALJ attributed some weight to Dr. Chambly's opinions, but he

-19-

was not required to incorporate all of the limitations of Dr. Chambly merely because he attributed weight to her opinions.  *See Smith v. Comm'r of Soc. Sec*., No. 5:11CV2104, 2013 WL 1150133 (N.D.Ohio, Mar. 19, 2013) ("[s]imply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight.").

Finally, Plaintiff points out that Dr. Kontos, her treating psychiatrist, provided much more restrictive limitations on her mental abilities than those found by the ALJ.  The ALJ considered Dr. Kontos' restrictions for Plaintiff, which included marked limitations in maintaining attention and concentration in his May 23, 2007 medical source statement and moderate limitations in maintaining attention and concentration in his December 15, 2008 medical source statement.  *Id.* at 31-32, 334-335, 415-416.  However, the ALJ gave little weight to Dr. Kontos' opinions, first noting that Dr. Kontos' treatment notes did not support the severe restrictions he had opined since he never assessed a GAF for Plaintiff that was under 51, which indicates only moderate impairment.  *Id*. at 32. Further, most of Dr. Kontos' treatment notes show that he found Plaintiff's attention and concentration to be "fair," "normal," or "average."  *Id*. at 328, 332, 351-352.  The ALJ also explained that he gave no special significance to Dr. Kontos' opinion that Plaintiff was unemployable since that is an issue reserved to the ALJ.  *Id*.  And finally, the ALJ cited to other evidence in the record that belied such severe restrictions, such as Plaintiff's reported daily activities of babysitting a one or two-year old child, writing stories and poetry, doing her daughter's hair and makeup, playing on the computer, cleaning her house, going camping with friends, walking her dog, reading for long periods of time, up to eight or ten hours at a time, making crafts and playing board games.  *Id.* at 30-31.  Plaintiff does not dispute the ALJ's application of the treating physician rule to Dr. Kontos' opinions or the weight attributed to each medical opinion in the record.  The Court finds that the ALJ provided good reasons for attributing less than controlling weight to Dr. Kontos' opinions and substantial evidence supports the ALJ's reasons for doing so.

Moreover, and based upon the same reasons, the Court finds that substantial evidence supports the ALJ's mental RFC for Plaintiff.  The ALJ reviewed the medical evidence concerning Plaintiff's mental health, properly applied the treating physician rule and explained the weight that

he attributed to Dr. Kontos' medical source statements and the statements of the other mental health professionals. Tr. at 27-33. He explained that he gave the most weight to the opinions of Dr. Sipps, who found no limitations on Plaintiff's ability to sustain concentration and persistence. *Id*. at 31, citing Tr. at 238. The ALJ explained that Dr. Sipps' opinion was most consistent with Plaintiff's reports of her daily activities of reading an entire book in one sitting, sometimes eight to ten hours at a time, writing poetry and short stories, doing her daughter's hair and makeup, paying bills and handling her finances, and watching television shows and movies that lasted more than sixty minutes. *Id*. at 31. The record supports Plaintiff's reports of such activities. *Id*. at 92, 95, 237-238, 442-444. The ALJ also found Dr. Sipps' opinion consistent with Plaintiff's post-onset work activity of trying to find a job and babysitting a one or two-year old child. *Id.* at 30, 431, 453-454. Further, Dr. Kontos' treatment notes confirm finding that Plaintiff's attention, concentration, memory and perceptions were at worst moderate as most of his notes described these areas as "fair," "normal," or "average." *Id.* at 328, 332, 351-352.

For the above reasons, and keeping in mind the standard of review, the Court finds that the ALJ properly considered the opinions of the medical sources and provided sufficient reasons for not including a speed and/or pace-based restriction for Plaintiff in his RFC, and, therefore, substantial evidence supports the ALJ's mental RFC for Plaintiff. Accordingly, the ALJ's corresponding hypothetical individual presented to the VE fully encompassed Plaintiff's limitations and the ALJ therefore had substantial evidence upon which to rely upon the VE's determination that significant jobs existed in the national economy for Plaintiff.

**VII.   CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and dismisses Plaintiff's complaint in its entirety with prejudice.


DATE: March 18, 2015


                                         */s/George J. Limbert*
                                         GEORGE J. LIMBERT
                                         UNITED STATES MAGISTRATE JUDGE


-21-